Exhibit 2





Maura Healey, Governor
Kimberley Driscoll, Lieutenant Governor
Monica Tibbits-Nutt, Secretary & CEO
Phillip Eng, General Manager & CEO

## MEMORANDUM

**TO**:       Jeff Cook, Acting Chief Administrative Officer
          Ahmad Barnes, Chief Workforce Officer

**FROM**:   Sam Zhou, AGM for Engineering and Capital Division

**DATE**:   March 15, 2024

**RE**:       Separation of Jennifer Tabakin, Program Manager, South Coast Rail

---

WORK HISTORY

Ms. Tabakin commenced her employment at the MBTA, effective June 23, 2019, as the Program Manager for the South Coast Rail program. In this position, she has been responsible for the construction of the commuter rail extension to New Bedford and Fall River. The South Coast Rail program is nearing completion, and management responsibilities for South Coast Rail will then be handed over to Railroad Operations. Under the timetable, this handover date had been expected to occur in the end of September 2024 for a long period of time. The date is now in flux as we are becoming aware of additional issues that could delay the project even further. As of the handover date, there would no longer be a need for the Program Manager position. I am recommending that the termination date for Ms. Tabakin's employment be moved up based on the conduct-related issues outlined below.

RECOMMENDATION FOR DISCHARGE

I am recommending the termination of Ms. Tabakin's employment because she has lost my confidence and the confidence of certain other members of the senior leadership team who are familiar with the South Coast Rail program. As a result, there is consensus that she cannot continue to lead the South Coast Rail program, and I am writing this on behalf of myself and others on the MBTA leadership team. Overall, Ms. Tabakin has: (1) mismanaged the project; (2) made repeated misrepresentations; (3) undermined my authority and refused to take direction; (4) engaged in inappropriate conduct toward me and others; and (5) inappropriately ignored or discounted others' viewpoints on how to handle a variety of issues, especially when those viewpoints conflicted with her preferred approach. Ms. Tabakin is a senior level manager, overseeing a billion-dollar program. To perform her job successfully, she needs to exercise sufficient oversight to manage the project. We also need to be able to rely on what she tells us. The Authority leadership is now distrustful that anything that she says could be a misrepresentation. The leadership is also concerned about how she interacts with people, generally. These are significant problems that make it impossible for her to continue in her role.

NARRATIVE

Ms. Tabakin has reported to me since September 2023. Over the past few months, certain Authority leadership, including myself, have become aware that Ms. Tabakin has engaged in problematic behavior for a manager at her level. One insurmountable problem is that she is not managing the project appropriately. Another glaring problem is that the Authority leadership can no longer rely on what she says, as she has misrepresented things on several occasions. In addition, Ms. Tabakin has been resistant to directions from multiple Authority leaders and has undermined the leaders' authority. Moreover, she has also reacted with hostility when I have questioned her on work-related matters and engaged in similarly unprofessional conduct with other personnel. She has also been resistant to accepting advice or direction from others. This is especially problematic, because to be successful, the project requires input from subject matter experts from other departments within the Authority.

Starting with mismanagement, the MBTA leadership has recently learned that Ms. Tabakin does not have adequate systems in place to manage the project effectively. We had asked a consultant, who has worked with the MBTA for years, to review the status of the project to see if things could be expedited to move up the completion date. This third-party schedule reviewer is still in the process of completing her analysis, but has conveyed that she has uncovered serious issues, which are expected to result in even further schedule delays.

During this same time, another consultant has reported that work on the project is behind schedule in other areas. For example, the project should be shortly "cutting over" certain operations to Mass Coastal Railroad ("MCRR"), which operates freight trains in the South Coast Railroad area, but there is no agreement in place between the MBTA and MCRR. Such an agreement should have been worked out well before now, as the original completion date for the entire project was in 2023. This consultant also reported that Ms. Tabakin does not have adequate systems in place to avoid further schedule erosion. For example, the civil work that needs to be completed requires appropriate sequencing of tasks. The consultant reported that he had asked for a status report that would include a full listing of tasks with projected completion dates and status updates – and Ms. Tabakin and the Project Management Construction Manager ("PMCM") were unable to provide such reports.

Turning next to misrepresentations, the MBTA leadership recently learned, from the third-party schedule reviewer, that she has uncovered instances where Ms. Tabakin had reported that certain civil construction tasks had been completed – and that *was not true*. The MBTA leadership has also learned, from the second consultant, that key milestones, such as the date for the cutover to MCRR, are *not being met*. By failing to provide truthful updates, Ms. Tabakin has led the General Manager, other Authority leaders, and me to believe there would be revenue service for South Coast Rail in 2024. Based on the recent reports from others (not Ms. Tabakin), it is unlikely that the project will be completed by the end of the year. This is a huge issue, as the General Manager had publicly reported a Summer 2024 revenue service date.

The following two additional examples illustrate many of the issues outlined above:

In late February, I directed Ms. Tabakin to follow a particular course of action on a human resources matter. Ms. Tabakin wanted to go in another direction. She told a human resources representative that she had my approval for adopting her preferred course of action – when this was not the case. I found out about this the next day when the human resources representative reached out to clarify the communications. Ms. Tabakin then tried to bypass me and HR by writing directly to the Acting Chief Administrative Officer, this time wrongly misrepresenting that she had the authority to act unilaterally. She then wrote several additional emails, where she again misrepresented my communications with her, making it appear as if I agreed to more than I had told her was possible. I wrote back to clarify the situation. In response, she tried to make it appear that I communicated something different to her, when this was not the case. I also learned that, during this time, she made a threatening comment to the HR representative, along the lines of "do you know how much authority I have."

In January 2024, I learned, after-the-fact, that Ms. Tabakin had scheduled a meeting with the General Manager (and other high-level MBTA personnel) with external stakeholders to discuss a proposed railroad extension, aka "full build" option – one that has not been approved. It became clear that Ms. Tabakin had scheduled this meeting without checking in with me or with the General Manager's office. She then objected to canceling the meeting even after she was told to do so by me and a representative of the General Manager's office. I subsequently told her that, at most, she could have an internal discussion with MBTA personnel. Ms. Tabakin instead went ahead with a meeting including external stakeholders. More recently, a similar pattern repeated itself. I found out that she scheduled another meeting, falsely claiming that I had agreed to this plan.

These two examples encapsulate much of the problematic conduct outlined above. The following additional examples illustrate specific problematic conduct:

(1) *Additional misrepresentations*: Ms. Tabakin has misrepresented project-related matters in her communications with others. For example, she had communicated that issues involving the use of continuous welded rail and other issues uncovered in the Federal Railroad Administration ("FRA") inspections were not serious, but the issues were greater than she had represented. As another example, and as described more fully below, Ms. Tabakin communicated one schedule to an Authority leader and a different schedule in open meetings. As another example, Ms. Tabakin misrepresented the cause of some of the earlier schedule delays. To avoid scrutiny of her own mismanagement of the project, she tried to blame those delays on changes to the methodology for milepost numbering. This contention is unsupported. Many other issues have caused, and will continue to cause, delays. Moreover, Ms. Tabakin could have avoided the need for a methodology change if she had involved the then Chief Railroad Officer in the initial planning stages of the project.

(2) *Additional resistance to my authority*: In February, I learned there would be a further schedule delay of the South Coast Rail Project – but not from Ms. Tabakin, who should have been

3

keeping me informed. In the week of March 11, a few Authority leaders were briefed by the third-party schedule reviewer (referenced above) that additional delays, as much as 77 days, are looming. Ms. Tabakin was fully aware of such delays during a March 7 project meeting. However, when I spoke to her on March 8 and specifically asked about the project schedule, she did not reveal such potential schedule delays at all.

(3) *Additional hostile and unprofessional conduct*: Ms. Tabakin reacted with hostility to my decision to involve the third-party schedule reviewer in the project. During a recent conversation, she resisted complying with this review and, at one point, issued a directive to me (even though I am her supervisor), demanding that I provide the scope of work to her in writing. She ended the conversation abruptly, making a comment, along the lines of "do you want me to quit?" and then hung up. She did apologize later. As another example, in January 2024, I learned that the FRA had assessed fines against the MBTA in connection with the South Coast Rail project. As Ms. Tabakin has responsibility for the project, I emailed her asking for information. She reacted with hostility. In a text message, she told me that, by asking questions, I was not "fair, appropriate or respectful." These comments were based on her (incorrect) interpretation of my email. In a text message, Ms. Tabakin also told me that I was "lucky" to have her, which is an inappropriate communication to have with your manager. I responded by explaining that her conduct was "way out of line" and that I had simply asked her some technical and procedural questions in an attempt to better understand the concerns that were raised and whether they had been addressed. I received a similar complaint about Ms. Tabakin's conduct approximately one month earlier. An individual reported that Ms. Tabakin had sought advice in handling a matter, and then started to attack this person – in that case, even using profanity and speaking over this person in a discourteous, inappropriate, and unprofessional manner.

(4) *Additional example of inappropriately ignoring or discounting others' viewpoints*: Several Authority leaders have become increasingly aware of Ms. Tabakin's resistance to involving Railroad Operations in the South Coast Rail project, or accepting their feedback, which is a problem because they are the end user and her "customer" on the project. When faced with opposition, she has employed her own outside "experts" to support her preferred approach at the Authority's expense. Instead, she should have been working cooperatively with Railroad Operations. At one point, Ms. Tabakin even refused to tell Railroad Operations about the timing for the start of service, even though they are her "customer" and need to know the timing for planning purposes.

Overall, Ms. Tabakin has not managed the project effectively. She has misrepresented what I or others have told her. She also has resisted advice or direction from me and others about how to handle certain matters and instead persisted in her preferred course of action. She had gone outside the chain of command, and threatened an employee, to try and get her way. She has treated me and others with hostility. Her overall approach, when faced with disagreements, is to try to get her way, ignoring input from others. While the MBTA leadership does not yet have the full report on the third-party schedule reviewer's findings, the issues uncovered to date are so serious that continuing Ms. Tabakin in her role is untenable.

4

For these reasons, I recommend that the Authority terminate Ms. Tabakin's employment.

DocuSigned by:

3A3AB1EB29C847D...

Sam Zhou

AGM for Engineering & Capital Division


**SIGNATURE CONCURRENCE**


Concur:

DocuSigned by:

C8238EF50D624B0...

Jeff Cook

Acting, Chief Administrative Officer


Concur:

DocuSigned by:

C905D70689224D6...

Ahmad Barnes

Chief Workforce Officer

5